UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOHN MARA,                          :
                                    :
      Plaintiff,                    :
                                    :
v.                                  :    Case No. 3:14-cv-1095 (RNC)
                                    :
CHIEF GARY MACNAMARA,               :
DETECTIVE STEPHEN RILLING,          :
DETECTIVE EDWARD NOOK,              :
SERGEANT FREDERICK HINE,            :
LIEUTENANT MICHAEL GAGNER,          :
SERGEANT ANTONIO GRANATA,           :
DETECTIVE JASON TAKACS, AND         :
TOWN OF FAIRFIELD,                  :
                                    :
      Defendants.                   :

RULING AND ORDER

     Plaintiff John Mara brings this action under 42 U.S.C. §

1983 against the Town of Fairfield and the following members of

the Fairfield Police Department: Chief Gary MacNamara, Detective

Stephen Rilling, Detective Edward Nook, Sergeant Frederick Hine,

Lieutenant Michael Gagner, Sergeant Antonio Granata and Detective

Jason Takacs.  Plaintiff claims the defendants conspired to

coercively interrogate, falsely arrest, and maliciously prosecute

him, in violation of his rights under the Fourth, Fifth and

Fourteenth Amendments.  He also brings state law claims for false

imprisonment, false arrest, intentional infliction of emotional

distress and malicious prosecution.  He claims the Town is liable

under a state indemnification statute.  Defendants move for

summary judgment.  For reasons explained below, the motion is

granted as to the claims against Chief MacNamara, Lt. Gagner, Sgt. Granata and Det. Takacs but denied as to the other claims.

I. Background

The record shows the following.  At a New Year's eve party during the late evening of December 31, 2012, or early morning of January 1, 2013, Philip Blackman was struck in the head with a bottle.  That morning, while Blackman was undergoing surgery, his father notified the Fairfield Police Department.  Det. Rilling, acting as lead investigator, and Det. Nook spoke to Blackman's father and several people who were at the party. The attendees told the detectives they had not witnessed the assault but had heard plaintiff was responsible. Later that day, while speaking to the host of the party at her home, the detectives were approached by David O'Brien, who informed them that Luke Kazmierczak witnessed the assault.

Later that day at the Fairfield Police Station, Kazmierczak stated that he saw the person who hit Blackman.  He said it was a white male in his twenties with short, dark-colored hair.  He told the detectives the suspect ran from the scene and was shirtless, highly intoxicated and out of control.  Det. Rilling obtained a photograph of plaintiff from his student ID at Fairfield University ("University").  Lt. Gagner, an officer in charge of technology and building photo arrays, created a photo array including plaintiff and five other young males with dark

hair and light skin. When Sgt. Granata showed the photo array to Kazmierczak, he selected a photograph of another individual with 70% certainty.

Later that day, plaintiff's mother called Det. Rilling. She said plaintiff had been told police were looking for him in connection with the assault and he was receiving threatening phone calls from Blackman's friends. According to plaintiff, Det. Rilling told her the police wanted to speak with plaintiff, but he was not the target of their investigation or a suspect. They made arrangements for Mara to come to the police station on January 2, 2013, at 5:00 p.m. Plaintiff had class at the University until around 3:00 p.m. At some point prior to the planned meeting, William Heller, an attorney who worked for plaintiff's father, spoke with Det. Rilling. According to Heller, Rilling told him plaintiff was not a target or suspect in the investigation and did not need an attorney to accompany him to the meeting.

On January 2, 2013, Det. Rilling, Dt. Nook and Sgt. Hine went to the University to speak with plaintiff.[1] Det. Rilling and a University Public Safety Officer were waiting for plaintiff by his car when his class ended. The officers were armed and had used their vehicles to block plaintiff's car. Det. Rilling

---

[1]According to defendants, Det. Rilling chose to meet plaintiff at the University to make him more comfortable, to avoid interference and to make sure he did not forget to go to the station. Plaintiff claims the officers intended to surprise and confront him.

asked plaintiff if he was willing to have the interview on campus
instead of the police station and plaintiff said yes.  The
officers took him to a small room in the Public Safety
department.

Once in the room, the officers told plaintiff he was not
under arrest but did not allow him to use his cell phone.[2]  They
asked him about New Years night and plaintiff admitted to
attending several parties that evening, including the party where
Blackman was struck.  He said he was drunk that evening and
couldn't remember parts of the night. From what he was told by
friends, though, he believed he did not arrive until after
Blackman was struck.  The detectives pressed him for more
information about that night and about the party.  Plaintiff
stated repeatedly that he did not remember assaulting Blackman,
whom he barely knew, and his friends had told him he did not
assault Blackman.  At one point, plaintiff mentioned he would
like to talk to some other people.  The detectives asked who
plaintiff wanted to talk to, and Mara responded "Um, my father.
Um, possibly a lawyer."  Det. Rilling then stated, "So, are you
saying you want to talk to a lawyer right now?" Plaintiff
responded, "No, no."

Despite plaintiff's repeated denials, the detectives
continued to press him. Det. Rilling posited that surveillance

_____

[2] Sgt. Hine observed the interview but did not participate and was not
involved in the investigation after the interview.

footage existed from the party and would show what happened, including whether plaintiff was guilty. The officers discussed their experiences with other suspects and said plaintiff would later look like a "sociopath" if he was lying. They said he could be "locked up" in Bridgeport if he was guilty. Det. Rilling stated,

> You're going to Bridgeport court and you're going to have to hang out with all the people that are drug addicts, that commit crimes and all that. There's a chance that you are going to get locked up for a little bit. You're going to end up with some guy that killed somebody, that robbed somebody, that likes to smoke crack, that likes to do drugs and cocaine, whatever. That's not you. That's not you. That's what I am saying to you. You don't belong there. That's why you need to make a decision right now of how we're leaving this. Because I am getting aggravated, I'm getting aggravated because you're closed off and you're not wanting to tell me.

Plaintiff responded, "But I've told you everything I know." Det. Rilling then asked why so many people were picking him as the one who committed the assault. Plaintiff responded, "I'm not sure. I would love to find out if I actually did it, I would have loved to find out from someone." After the detectives continued to press plaintiff, he eventually said, "I was drunk and I don't remember some, like a lot of the night, so there's a chance it could have happened."

According to plaintiff, he was afraid of Det. Rilling. In the interrogation room, plaintiff was in a corner and Det. Nook was blocking the door. Plaintiff thought Det. Rilling was being aggressive, and in the small room, he felt he had no choice but

to talk to the officers.  Plaintiff later stated in his
deposition,

> It made me question myself. I mean, it was something I knew
> I did not do. They just got into my head so much that, you
> know, I could be going to jail for something that I -- had
> no involvement in. . . . He was trying to get me to believe
> I did it, and they messed with my head so much that when I
> left, I was doubting myself. Even though going into it I
> knew I did not do this, they - - they messed with my head so
> much while I was in there that I was questioning myself.

He said that when he asked to speak to a lawyer, "I got a
horrible response from them . . . it was aggressive, loud. They
made me feel like if I got up and left, they would be sending me
to jail in Bridgeport with murderers and that's why I decided to
stay because of what they said and how they said it." Plaintiff's
father testified that when he saw his son after the
interrogation, plaintiff started crying.

Upon meeting plaintiff in person, Det. Rilling thought he
looked different than in his student ID photo, so he took an
updated photo during the interview.  This photo was provided to
Lt. Gagner, who prepared a second photo array including plaintiff
and five other young males with dark hair and light skin.
Plaintiff was the only person who appeared in both arrays.
Kazmierczak returned to view the second photo array and selected
plaintiff's photo with 100% certainty.  He later provided a sworn
statement that plaintiff was the assailant.

On January 3, 2017, David O'Brien went to the Fairfield
Police Department.  O'Brien reported that he was at the party at

the time of the assault.  Though he did not witness the assault, he said Kazmierczak pointed out the assailant at the party soon after the assault.  Det. Takacs showed O'Brien the second photo array and asked him whether he could identify the person Kazmierczak had pointed to. O'Brien selected the photo of plaintiff with 100% certainty.  He gave a sworn statement that Kazmierczak had pointed to plaintiff. He also said he had taken a photo of plaintiff that night after Kazmierczak identified him as the person who struck Blackman.

Det. Rilling also interviewed Daniel Langlais, who attended the party with Blackman and knew plaintiff from class.  He said he saw Blackman being pushed out of the house.  Langlais intervened but was tackled.  When he got up, he saw a group of people standing around Blackman.  He heard someone shout his name and saw it was plaintiff, who had no shirt and was "jumping around crazy."

Not all the people interviewed by defendants pinned the assault on plaintiff.  Plaintiff's friend Kyle Cullam told Det. Rilling that plaintiff and his friends all arrived at the party after the assault occurred.  Two other friends confirmed this version of events. Plaintiff's brother, Sean Mara, stated that the assault occurred before he and his brother arrived at the party.  He also stated his brother was drunk, shirtless for part of the evening and acting "crazy."  At one point, Sean put

plaintiff in a choke hold and punched him because of how he was acting.

On February 21, 2013, Det. Rilling prepared an arrest warrant for Mara. His supporting affidavit contained information about both photo arrays and summarized the various interviews the detectives conducted. The warrant was reviewed by Sgt. Granata, Lt. Gagner and State's Attorney John Smriga. Smirga determined there was probable cause and signed the warrant. The warrant was signed by Judge Devlin on Feburary 22, 2013. Plaintiff turned himself in and posted bond.

After plaintiff's arrest, Det. Rilling received an anonymous phone call from a woman who said the wrong person was in custody. Two weeks later, another caller stated that two of John Cordone's friends were involved in Blackman's assault. Det. Rilling spoke with Cordone and concluded that Cordone's friends committed the assault. Det. Rilling contacted State's Attorney Smriga regarding this new evidence. Smriga decided to nolle plaintiff's charges and the case was dismissed on October 3, 2013.

II. Discussion

Defendants move for summary judgment as to all claims, arguing plaintiff has not produced sufficient evidence to prove his claims, the officers are entitled to qualified immunity, many of the officers were not personally involved, and the Town is not subject to liability under these circumstances.

A.  Legal Standard

Summary judgment may be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  To avoid summary judgment, the non-moving party must point to evidence that would permit a jury to return a verdict in his or her favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  In determining whether this standard is met, the evidence must be viewed in the light most favorable to the non-moving party.  Id. at 255.

B.  Liability Under Section 1983

To recover under section 1983, a plaintiff "must allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United Stats." Snider v. Dylag, 188 F.3d 51, 54 (2d Cir. 1999).

Qualified immunity shields defendants from liability unless they violate clearly established rights that an objectively reasonable official would have known.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  "Official conduct violates clearly established law 'when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing

violates that right.'" <u>Terebesi v. Torreso</u>, 764 F.3d 217, 230 (2d Cir. 2014) (quoting <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 741 (2011)).  To determine whether a right was clearly established, courts consider "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful."  <u>Jermosen v. Smith</u>, 945 F.2d 547, 550 (2d Cir. 1991).

C.   <u>Fifth Amendment Self-Incrimination Claim</u>

Plaintiff claims that Det. Rilling and Det. Nook violated his Fifth Amendment right against self-incrimination when he was interrogated. The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V.  The key inquiry is whether, looking at the totality of the circumstances, inculpatory statements used in a criminal case were obtained by coercion.[3] <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973). The totality of the surrounding circumstances test asks whether the complainant's "will was overborne by looking at both the characteristics of the accused and the details of the

---

[3] Use in a criminal case is broadly defined.  <u>Higazy v. Templeton</u>, 505 F.3d 161, 173 (2d Cir. 2007) (holding that use of a coerced statement at a pretrial bail hearing violates the Fifth Amendment); <u>Weaver v. Brenner</u>, 40 F.3d 527 (2d Cir. 1994) (holding that use of a coerced statement at a grand jury proceeding violates the Fifth Amendment).

interrogation." Id. Courts consider the "experience, background, and education of the accused; the conditions of the interrogation; and the conduct of the law enforcement officials, notably, whether there was physical abuse, the period of restraint in handcuffs, and use of psychologically coercive tactics, including whether police engaged in trickery." Dallio v. Spitzer, 170 F. Supp. 2d 327, 339 (E.D.N.Y. 2001) aff'd, 343 F.3d 553 (2d Cir. 2003).

Here, plaintiff alleges the defendants lied to and intimidated him until he told them what they wanted to hear. Viewing the evidence in the light most favorable to plaintiff, I agree.[4] Plaintiff was 21 years old, had limited experience dealing with police or police interrogation, and thought he was going to the police station with his father merely to help clear up the confusion stemming from the assault.  Instead, the officers surprised him after class, blocking his car and intimating that he had to talk to them right away.  During the interview, the officers told plaintiff they would put him in prison with dangerous individuals.  They told him that if he did not confess, he would look like a sociopath.  After one and a half hours of interrogation, and after the officers refused to believe his repeated statements that he had told them everything

---

[4] Plaintiff also alleges that the defendants violated his Miranda rights. Miranda v. Arizona, 384 U.S. 436, 479 (1966).  However, Miranda violations do not give rise to a claim for damages under § 1983.  Chavez v. Martinez, 538 U.S. 760, 767 (2003) (plurality); Weaver v. Brenner, 40 F.3d 527, 534 (2d Cir. 1994).

he knew, he acquiesced to their version of events.  In the end, he stated, "I was drunk and I don't remember some like a lot of the night so there's a chance it could have happened." Plaintiff's statement was then used against him to obtain an arrest warrant and support an information charging him with felony assault.

Plaintiff has shown a genuine dispute of fact as to whether his will was overborne resulting in an inculpatory statement that was used against him. The right against self-incrimination in the interrogation context, as articulated in <u>Schneckloth</u> and other cases, is clearly established.  Thus, if plaintiff can prove his Fifth Amendment claim, the officers will not be entitled to qualified immunity, making summary judgment inappropriate.

D.   <u>Due Process Eyewitness Identification Claim</u>

Plaintiff claims the witness identification procedure used by the defendants violated due process.  To prevail on this claim, he must show that the procedure was unnecessarily suggestive and, looking at the totality of the circumstances, there was a "substantial likelihood of misidentification."  <u>Perry v. New Hampshire</u>, 565 U.S. 228, 239 (2012).  "The fairness of a photographic array depends on a number of factors, including the size of the array, the manner of presentation by the officers, and the array's contents."  <u>United States v. Concepcion</u>, 983 F.2d 369, 377 (2d Cir. 1992).  A suggestive procedure, standing alone,

does not constitute a constitutional violation: plaintiff must show the "right to a fair trial . . . was impaired by the admission of testimony regarding the unreliable identification." Wray v. City of N.Y., 490 F.3d 189, 193 (2d Cir. 2007).

Plaintiff claims the eyewitness identification was improper and unnecessarily suggestive because Kazmierczak failed to identify him in the first photo array and he was the only person who appeared in both arrays shown to Kazmierczak.  Including a suspect's photo in two photo spreads is not necessarily constitutionally impermissible. See United States v. Maguire, 918 F.2d 254, 263 (1st Cir. 1990) (permissible even if it is the same photo).  However, whether the use of two photos is permissible in a particular case is a highly fact-intensive inquiry. See Gilbert v. Superintendent of Collins Corr. Facility, No. 03 CIV.3866 LBS, 2004 WL 287683, at *10-11 (S.D.N.Y. Feb. 11, 2004) (finding, post-trial, that since witness had seen suspect previously and the pictures of the accused in two photo arrays were noticeably different, multiple viewings were not unduly suggestive). Viewing the evidence in a manner most favorable to the plaintiff, a reasonable jury could find the photos were impermissibly suggestive and there was a likelihood of misidentification. Therefore, summary judgment is not appropriate.

E.   <u>False Arrest and Malicious Prosecution Claims</u>

Plaintiff claims the defendants falsely arrested and maliciously prosecuted him in violation of the Fourth Amendment and state law.  To establish a claim for false arrest in violation of the Fourth Amendment, plaintiff must show: "(1) the defendant intentionally arrested him or had him arrested; (2) the plaintiff was aware of the arrest; (3) there was no consent for the arrest; and (4) the arrest was not supported by probable cause."  <u>Shattuck v. Town of Stratford</u>, 233 F.Supp.2d 301, 306 (D.Conn. 2002) (citation omitted). Plaintiff's false arrest claim requires a showing that his physical liberty was restrained by the defendants and the restraint was against his will - "that is, that he did not consent to the restraint or acquiesce in it willingly."  <u>Lo Sacco v. Young</u>, 20 Conn. App. 6, 19, 564 A.2d 610, 617 (Conn. App. 1989), <u>cert. denied</u>, 213 Conn. 808, 568 A.2d 793 (1989).  Malicious prosecution claims require a showing that: "(1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff, (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice." <u>McHale v. W.B.S. Corp.</u>, 187 Conn. 444, 447, 446 A.2d 815 (1982).

For all three claims, the existence of probable cause is a

complete defense, "whether the action is brought under state law or under Section 1983." <u>Frey v. Maloney</u>, 476 F. Supp. 2d 141, 150 (D. Conn. 2007).  Probable cause "exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."  Walczyk v. Rio, 496 F.3d 139, 156 (2d Cir. 2007)(quotations and citations omitted).  An officer is entitled to qualified immunity if he can show the arrest was supported by "arguable probable cause," which exists if either (a) "it was objectively reasonable for the officer to believe that probable cause existed," or (b) "officers of reasonable competence could disagree on whether the probable cause test was met."  <u>Escalera v. Lunn</u>, 361 F.3d 737, 743 (2d Cir. 2004).  While the arguable probable cause standard is "more favorable" to officers than the probable cause standard, it is not toothless: qualified immunity will not apply if reasonable officers "would have to agree" that the information does not "add up" to probable cause - even if it "came close."  <u>Ackerson v. City of White Plains</u>, 702 F.3d 15, 21 (2d Cir. 2012).

Plaintiff claims he was falsely arrested on two occasions: when Det. Rilling and Det. Nook interrogated him at the University, and when he turned himself in after the defendants obtained an arrest warrant.  Viewing the evidence in a manner

most favorable to the plaintiff, there is a genuine dispute as to whether he was falsely arrested during the interrogation at the University.  When the officers first approached him, they were armed and had used their vehicles to block his car, preventing him from leaving.  He was surprised by their presence on campus, felt coerced and did not feel free to leave.  At that time, there was merely a rumor he was the assailant; no one had positively identified him in a line up or photo array, and the officers had no concrete evidence linking him to the assault.  Thus, they lacked even arguable probable cause for an arrest.

There is also a genuine dispute as to whether plaintiff was falsely arrested when he was confined pursuant to the arrest warrant.  The issuance of a warrant by a neutral magistrate creates a presumption that it was objectively reasonable for the officer to believe probable cause existed.  Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991).  This presumption can be overcome, however, if the officer who applied for the warrant knowingly or recklessly included false statements or omitted material information in the affidavit, and the false or omitted information was necessary to the finding of probable cause. Walczyk, 496 F.3d at 155-56. To determine whether false or omitted information was necessary to establish probable cause for the issuance of a warrant, courts consider whether probable cause still exists when the challenged affidavit is "corrected."  See

Pines v. Bailey, 563 F. App'x 814, 817 (2d Cir. 2014). Errors are not material if, after correcting any misstatements and including any omitted information, the corrected affidavit would have been "sufficient to support arguable probable cause." Escalera, 361 F.3d at 743-44. If the corrected affidavit provides "an objective basis to support arguable probable cause," any remaining factual disputes are not material to the qualified immunity determination, and the defendant is entitled to summary judgment. Id.

According to plaintiff, his arrest warrant was premised on 1) a coercive interrogation, and 2) a constitutionally defective identification. As discussed above, there is a genuine dispute as to whether plaintiff's interrogation was coercive and the eyewitness identification procedure was permissible with respect to Kazmierczak. There is also a genuine dispute as to whether the officers recklessly included this information.[5] Excluding these two pieces of evidence, the arrest warrant was premised on the following evidence: 1) plaintiff attended the party where the assault occurred; 2) plaintiff was highly intoxicated and acting erratically that night; 3) plaintiff was chosen out of a photo

_____

[5] The officers interrogated plaintiff for one and a half hours. Plaintiff "admitted" he might be the assailant only after the officers repeatedly pressed him about the party and suggested he would look like a "sociopath" if he were lying. Det. Rilling and Det. Nook may have known this "admission" was suspect. The officers were also on notice Kazmierczak's identification might be suspect because he had failed to identify plaintiff the first time they showed him a photo array.

array by O'Brien, who had not himself witnessed the assault; and 4) Langlais placed plaintiff at the party shirtless and acting crazy at the time of the assault.  Given that there was no direct evidence linking plaintiff to the assault, there is a genuine dispute as to whether there was arguable probable cause at the time the officers obtained the warrant.  Thus, summary judgment is not appropriate.

D.    Fourteenth Amendment Substantive Due Process and Inentional Infliction of Emotional Distress Claims

To prove a Fourteenth Amendment substantive due process violation, plaintiff must provide evidence of coercive custodial interrogation techniques that "shock[] the sensibilities of a civilized society."  Deshawn E. by Charlotte E. v. Safir, 156 F.3d 340, 346 (2d Cir. 1998) (quoting Moran v. Burbine, 475 U.S. 412, 433-34 (1986)).  A claim for intentional infliction of emotional distress requires a showing of conduct that is "so extreme and outrageous that it goes beyond all possible bounds of decency, is regarded as atrocious, is utterly intolerable in a civilized society, and is of a nature that is especially calculated to cause, and does cause, mental distress of a very serious kind."  Miner v. Town of Cheshire, 126 F. Supp. 2d 184, 194 (D. Conn. 2000).

Plaintiff may be able to prove the elements of these claims. Crediting his account, and giving him the benefit of all reasonable inferences, the officers deliberately surprised him

when they confronted him on campus and, in accordance with a calculated plan, gained an advantage by causing him to think he could not leave.  They did this in order to interrogate him when he would be alone and unaccompanied by his father.  They aggressively interrogated him over one and a half hours.  They threatened him with incarceration and caused him to fear that he was going to be locked-up in jail, where he would be at the mercy of dangerous, hardened criminals.  They did not relent until they got him to say that their version might be true.  He was visibly distressed immediately after the interrogation.  He was later arrested and held in custody based on a defective warrant.  A reasonable jury could conclude that this conduct was sufficiently beyond the pale to justify a verdict in favor of the plaintiff.

D.    Individual Defendants and Conspiracy Claims

Plaintiff brings his claims against numerous defendants.  A defendant is liable under section 1983 only if he "subjects or causes [plaintiff] to be subjected" to a constitutional deprivation. 42 U.S.C. § 1983.  Thus, plaintiff must establish causation as to each defendant.  To prove a conspiracy, he must show an agreement "to act in concert to inflict an unconstitutional injury" and "an overt act done in furtherance of that goal causing damages." Ciambriello v. Cty. of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002).  To prove aiding and abetting under state law, plaintiff must show: 1) a wrongful act; 2) that

the actor was "generally aware of his role as part of an overall illegal or tortious activity" when he provides the assistance; and 3) the actor "knowingly and substantially assist[ed] the principal violation." Fink v. Magner, 988 F. Supp. 70, 72 (D. Conn. 1997) (quotation marks and citation omitted).

Several defendants had little to no involvement in plaintiff's case. Lt. Gagner was uninvolved beyond reviewing the arrest warrant and compiling photo arrays, which was a part of his role in the department.[6] Sgt. Granata merely presented the photo arrays. Det. Takac's role was limited to presenting a photo array to David O'Brien. I agree with defendants that this evidence is insufficient to prove individual liability under section 1983. Thus, Lt. Gagner, Sgt. Granata, and Det. Takacs are entitled to summary judgment on all counts against them.[7]

Defendants also argue Chief MacNamara lacks any involvement beyond supervising the other defendants. Supervisors cannot be held liable under section 1983 solely on a theory of respondeat superior. Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003). Plaintiff must show with specific facts that a supervisor was personally involved in a constitutional violation. Id. Chief MacNamara was not involved in the investigation and did not write

---

[6] Det. Rilling made the decision to include different photos of the plaintiff.
[7] Sgt. Hine was present when plaintiff was confronted at the University but did not participate in the interrogation or any other subsequent events. Although his role was limited, I find there is a genuine dispute as to whether he is liable for false arrest.

or review plaintiff's arrest warrant.  In fact, plaintiff has failed to provide any evidence that Chief MacNamara was even on notice of what the other defendants were doing.  Because plaintiff has failed to provide evidence of individual liability, Chief MacNamara is entitled to summary judgment as to all counts against him.

      F.   <u>Municipal Liability</u>

Defendants argue that, even if the individual defendants violated plaintiff's rights, the Town is not liable. To hold the Town liable under Section 1983, plaintiff must show that it caused the constitutional deprivation through an official "policy or custom" of the municipality or a municipal officer responsible for establishing official policy. <u>See</u> <u>Hartline v. Gallo</u>, 546 F.3d 95, 103 (2d Cir. 2008) (citing <u>Monell v. Dep't Social Servs. City of New York</u>, 436 U.S. 658, 695 (1978)). Plaintiff has made no such allegations and provided no evidence the Town or a final policymaker caused his injuries.

Plaintiff argues instead that the Town is liable under Conn. Gen. Stat. § 7-465, which requires municipalities to pay "all sums which [employees] become[] obligated to pay . . . for damages awarded for infringement of any person's civil rights." Defendants appear to concede that the Town will be required to indemnify any of the individual defendants if plaintiff can prove liability as to any of them. Because summary judgment is denied

as to some individual defendants, the indemnification claim
remains as well.

III. <u>Conclusion</u>

Accordingly, the motion for summary judgment [ECF No. 98]
is granted in part and denied in part.

So ordered this 30th day of September 2017.

_____/s/_____
Robert N. Chatigny
United States District Judge
